REIGER & THOMPSON, Appellants, v. CHARLES B. MERRILL et al., Respondents.

### Kansas City Court of Appeals, June 3, 1907.

1. **REAL ESTATE BROKER: Commission: Liability of Principal.** A broker employed to sell for a commission is entitled to pay when he makes a sale in good faith according to his instructions, and the principal cannot relieve himself from liability by refusal to consummate the sale or by his voluntary act disabling him from performance.

2. ———: ———: **Principal's Assurance.** The unconditional employment of a broker carries with it an implied assurance that the principal will place himself in a position to make good title, and the principal will not be heard to deny his obligation on the specious pretext that he finds himself unable to perform his agreement.

3. ———: ———: **Title: Principal's Agreement.** Where the principal at the time of the employment has not the title, and in his contract, either by express terms or by necessary implication, provides against the contingency of not being able to perform, there can be no recovery on the production of a purchaser by the agent where the principal has acted in good faith and honestly endeavored to acquire the title.

4. ———: ———: ———: ———: **Evidence: Instructions.** Evidence reviewed and it is held the instructions properly submitted the issue of the principal's good faith to the jury.

Appeal from Jackson Circuit Court.—*Hon. James H. Slover*, Judge.

AFFIRMED.

*Hayward & McLane* for appellants.

(1) The court below erred in giving instruction numbered 3 asked by defendants, and refusing instruction numbered 5, asked by plaintiffs. Goodson v. Embleton, 106 Mo. App. 77; Nesbit v. Helser, 49 Mo. 383; Finch v. Trust Co., 92 Mo. App. 263; Reeves v. Vette, 62 Mo. App. 440; Tyler v. Parr, 52 Mo. 249; Gwinnup v. Sibert, 106 Mo. App. 709; Brown v. Smith, 113 Mo.

App. 59; Hayden v. Grillo, 42 Mo. App. 1; Sallee v. Mc-Murray, 113 Mo. App. 253; Gellatt v. Ridge, 117 Mo. 553. (2) The court below erred in giving instruction numbered 4, asked by defendants. Brown v. Smith, 113 Mo. App. 59; Christensen v. Wooley, 41 Mo. App. 53; Gerhart v. Peck, 42 Mo. App. 644; Harwood v. Diemer, 41 Mo. App. 48. (3) The court below erred in giving instruction 2 asked by the defendants. Casey v. Bridge Co., 114 Mo. App. 47; Magraw v. Railway, 183 Mo. 119; Goodwin v. Railroad, 75 Mo. 73.

*Meservey, Pierce & German* for respondents.

(1) No error was committed in the giving of instruction numbered 3 asked by defendants. (a) Because the element which plaintiffs contend should have been inserted had no evidence to support it and was properly omitted. (b) But in any event the omission was supplied by other instructions. Benham v. Taylor, 66 Mo. App. 314; Hughes v. Railroad, 127 Mo. 452; Anderson v. Railroad, 161 Mo. 411. (2) The instructions must be considered as a whole and harmonized when possible. Hughes v. Railroad, 127 Mo. 452; Benham v. Taylor, 66 Mo. App. 308; Anderson v. Railroad, 161 Mo. 427; Reno v. St. Joseph, 169 Mo. 642; Harrington v. Sedalia, 98 Mo. 583. (3) No error was committed in giving of defendants' instruction numbered 4. Budd, et al. v. Zoller, 52 Mo. 238; Hoyt v. Shipherd, 70 Ill. 309. (4) The court properly refused plaintiff's instruction numbered 5. (a) Because there was no evidence on which to base it. (b) Because it was ambiguous and misleading. (c) Because its place was supplied by plaintiff's instruction numbered 3 modified and given by the court.

JOHNSON, J.—Action by real estate agents to recover from their principal a commission alleged to have been earned under contract of employment. Defend-

ants prevailed in the circuit court and the cause is here on appeal of plaintiffs.

Charles and Henry Merrill, the defendants, are brothers and, together with their mother and their brothers, John and William, inherited the estate of their father who died sometime before the occurrence in question. Part of the estate consisted of lots in Kansas City on which was situated an office building known as the New Nelson building. The heirs held the title to this property as tenants in common and were all of legal age. Plaintiffs, who were partners engaged in the business of real estate agents in Kansas City, had been employed by John and Daniel Small, who are brothers, to negotiate a sale or exchange of a large ranch in Kansas, the title to which stood in the name of a corporation. The Small brothers owned all of the capital stock of the corporation and were in control of its affairs. In July, 1904, plaintiffs in the course of this employment, began negotiations with William Merrill for the purpose of effecting an exchange of the office building for the ranch. The Merrill heirs, thereupon, employed plaintiffs as their agents to procure an exchange of the properties, and plaintiffs brought about a meeting of the Small brothers and some of the Merrill heirs in order that the terms of the exchange might be discussed and agreed upon, if possible. Each of the parties knew that plaintiffs were acting as the agents of both, and it was agreed between them that, in the event an exchange was consummated, plaintiffs should receive from each party a commission of two per cent of the value of the property exchanged by such party and for the purpose of ascertaining the amount of the commission, it was understood that the office building and ranch should each be valued at the sum of two hundred thousand dollars, so that in the event of a trade, plaintiffs would receive a commission of four thousand dollars from the heirs.

The agreements we have mentioned were not re-

duced to writing, but there is no substantial difference among the witnesses relative to their terms. Plaintiffs assisted in the negotiations which ensued between their principals, several meetings were held at which different proposals were discussed without an agreement being reached, and finally, on the sixth of August, a proposition was made by the Small brothers to the heirs, which the latter took under advisement. On the eighth of August, William Merrill, who, it appears, had been acting as spokesman for the heirs, attended a meeting at which plaintiffs and defendants were present, where he announced that the negotiations were at an end so far as the heirs were concerned, as they found it impossible to agree among themselves, but that the defendants, Charles and Henry Merrill "had entered into negotiations with the members of the family to acquire the Nelson building and the others of the family were to take other properties and this building would be the shares of Charles and Henry; that the other members of the family were out of the deal and that Rieger and Thomson would have to carry on the further negotiations through the defendants." The above quotation is from the testimony of plaintiff Rieger, who further said that at that meeting "Mr. Will Merrill made a counter proposition to the one already made by the Smalls for Charles and Henry in respect to the exchange of properties. Will Merrill also stated that all commissions and arrangements would have to be made with the boys, meaning Charles and Henry Merrill, individually. Will Merrill then retired and the question of commissions was taken up and talked over. Charles and Henry offered first one thousand dollars and finally two thousand dollars as commissions, but plaintiffs would not agree to this. Then it was agreed that each side should pay the same and Charles and Henry Merrill should pay the same as the Smalls paid." Defendants then instructed plaintiffs to submit a counter proposition to the .

Small brothers, which they did, but it was rejected. On August 12, all of the negotiators met in Kansas City. Mr. Rieger gives the following account of what transpired at that meeting:

"Henry Merrill said 'Gentlemen, we have got together, and we have come here to get together. We own the building and we are ready to make a proposition. We can deliver the goods.' Defendant Charlie Merrill asked for a final proposition from the Smalls who retired and then told plaintiffs what they (the Smalls) would do, but before submitting it, he, Rieger, stated that if it was accepted the plaintiffs would expect a four thousand dollar commission from each side. He then stated the Smalls' proposition. The defendants went out and after talking it over with plaintiffs, came back into the room and said to the Smalls, Charlie Merrill speaking, 'Gentlemen, we accept your proposition.' The parties then adjourned to fix up the papers the next morning."

On cross-examination: "Q. To refresh your recollection, I will ask you to state what was said on the night of August 12, at the hotel, as to what was to be done the next day—what was necessary to be done the following day in order to consummate the deal? A. The Smalls were to get together and make a transfer of this property to the Merrills. I didn't know whether it was in the shape of an agreement, or contract, or quit-claim deed, or what it was, I didn't care. Q. Do you remember that it was stated there at that time that in the morning Henry and Charlie would procure from the other heirs a transfer of the property to them, and after that was done the transfer to the Smalls would be made? A. I do not. I have a slight recollection of that from a conversation I had with Mr. Small afterwards, but I can only state how he regarded it."

Daniel Small, introduced as a witness by plain-

tiffs, testified on cross-examination as follows: "Q. Now on the occasion of the talk at the hotel about the twelfth or thirteenth of August, I understood you to say on direct examination that there was a statement made there that the boys had settled with their brother John and were ready to enter into negotiations with you; who said that? A. I think my friend Charles. Q. Charles Merrill? A. Yes, sir; he and Henry were both present. Q. And who else? A. My brother, J. D., Mr. Rieger and Mr. Thomson. Q. Then what occurred after that statement was made? A. We figured back and forth and finally agreed upon a basis of exchange. Mr. Merrill said that they had agreed with their brother so that they would have the building, and that they would meet their attorneys the next morning, and it was all arranged to draw the papers; they would be down here with their machine (they meant their automobile) and as soon as the papers were ready they would take them, sign them, and have their mother and brother William sign them; and at that time I asked Charles Merrill if his brother John would sign them. He said 'Yes; I have no fear of John; when John agrees to do a thing he will do it.' Q. Was there anything said at that time about whether or not they had any writing with John about the matter? A. They had made an agreement. Q. Do you know whether it was in writing? A. I did not understand it to be in writing; they were to meet the next morning and put it in writing." This statement was corroborated by John D. Small.

Defendants testified, in substance, that the statement they made at the meeting on the twelfth of August was that they had come to an understanding with their brother John and that they were "in a position to negotiate the deal," and that the acceptance of the proposition made by the Small brothers was expressly conditioned on the consummation of the purchase by them of the interests of the other heirs in the Nelson building.

The next day, John Merrill repudiated his oral agreement to convey his interests to defendants and imposed terms which defendants deemed too onerous to accept. Defendants thus being unable to acquire the title to the office building could not effect an exchange of the properties and the negotiations between them and the Small brothers came to an end. There is no direct evidence that the refusal of John Merrill to abide by his oral agreement was in any way inspired by defendants.

The issues submitted to the jury are thus defined in the third instruction given on behalf of plaintiffs and in the fourth given for defendants. The first of these is as follows: "The court instructs the jury that if you find from the evidence that the defendants represented themselves to be able to trade the New Nelson building for a ranch owned or controlled by J. D. Small and D. J. Small, and accepted a proposition to trade made by said J. D. Small and D. J. Small, even though the proposition for exchange and acceptance were not in writing, the defendants cannot now say that they did not own the New Nelson building and could not trade it, for the mere purpose of defeating the plaintiffs in this action."

The other instruction is as follows: "The jury are instructed that if you should find and believe from the evidence that plaintiffs were employed by the defendants in connection with a proposed trade of the Nelson building for the Small brothers' ranch, and that at the time of such employment, if any, plaintiffs knew that the title to the Nelson building was vested in the heirs of the late John W. Merrill, deceased, consisting of these defendants, their two brothers and their mother, and knew that in order to consummate the transaction it was necessary for defendants to obtain from their two brothers and their mother a transfer of their interests to defendants, and that defendants have in good faith endeavored to procure from their two brothers and

their mother a transfer of their interests to defendants, but have been unable to do so, then your verdict will be for the defendants."

Complaint is made by plaintiffs of the refusal further to instruct the jury that "if you find from the evidence that it was agreed between the plaintiffs and defendants that plaintiffs were not to be paid any commission unless the defendants actually traded the New Nelson building for the ranch and personal property controlled by J. D. Small and D. J. Small, and passed the title and possession of said properties, and if you find that it was the act of the defendants which prevented said exchange being made, you will find for the plaintiffs, if you find that the plaintiffs procured a person or persons who were ready and able to make such trade on terms satisfactory to defendants."

Plaintiffs when first employed undertook the task of serving two masters but acted fairly and had they succeeded in bringing their principals to an agreement for an exchange of the properties, there can be no doubt they would have been entitled, upon consummation of the transaction, to receive the commission which each had agreed to pay; and, had an agreement for an exchange been made, but its consummation prevented by the refusal of one of the principals to effectuate it, the right of plaintiffs to receive the commission which the defaulting principal had agreed to pay, would not have been impaired by the wrongful act of such principal in refusing to close the transaction. But the owners of the ranch and the Merrill heirs failed to agree on the terms of an exchange and when the negotiations between them were terminated, plaintiffs were not entitled to a commission from either side, for the reason that they had failed to accomplish the very thing they had been employed to do,—that is, to bring the parties to an agreement. They had failed to produce to either principal a purchaser who

was ready, willing and able to purchase the property of such principal on acceptable terms.

With affairs in this state, two of the Merrill heirs (the defendants,) believing they could effect a trade satisfactory to themselves, undertook to obtain the title to the office building, and then to exchange it for the ranch. They made a new agreement with plaintiffs to engage their services, and all of the evidence shows beyond question that the employment of plaintiffs under this last agreement was on terms which made their right to receive a commission from defendants dependent on the consummation of two things: The acquisition by defendants of the interests of the other heirs, and the successful closing of negotiations with the owners of the ranch for an exchange of properties on terms satisfactory to defendants.

The principle is quite well established "that a broker employed to make a sale under an agreement for a commission is entitled to pay when he makes a sale according to the instructions and in good faith and the principal cannot relieve himself from liabilty by refusal to consummate the sale or by voluntary act of his own disabling him from performance." [Goodson v. Embleton, 106 Mo. App. 77; Gwinnup v. Sibert, 106 Mo. App. 709; Finch v. Trust Co., 92 Mo. App. 263; Hayden v. Grillo, 42 Mo. App. 1.] And equally well settled is the rule that where the broker has devoted his time and labor in a transaction to which he was moved by his principal, he cannot be defeated of his compensation because his principal finds himself unable to perform on account of a defect in the title. The unconditional employment of an agent carries with it the implied assurance that in the event he succeeds in negotiating a sale on the terms proposed, his principal will place himself in a position to make a good title, and after the agent has acted on such assurance to his detriment, the principal will not be heard to deny his obligation on the specious

pretext that he found himself unable to perform his agreement. That is a matter he should think of and provide against at the time he enters into his obligation. [Brown v. Smith, 113 Mo. App. 59; Sallee v. McMurry, 113 Mo. App. 253; Young v. Ruhwedel, 119 Mo. App. 231; 96 S. W. 228; Curry v. Whitmore, 110 Mo. App. 204.] But where a principal, at the time of the employment, is not invested with the full title to the property, and in the contract of employment provides, either in express terms or by necessary implication, against the contingency of not being able to perform, there is no reason in law or morals to justify the recovery by the agent of the agreed commission on the production of a purchaser who is ready, able and willing to buy on the terms proposed. Unquestionably, parties to such contracts have the right to agree that the agent shall receive no compensation in the event the principal finds himself unable to perform, and as long as the latter acts in good faith and honestly endeavors to acquire the title, the agreement of the parties should be enforced. [Budd v. Zoller, 52 Mo. 238.] In the present case, the only construction that can be placed upon the contract of employment is that the parties themselves intended that defendants should not become bound either to the owners of the ranch or to the agent in case they were unable to acquire the interests of the other heirs on terms satisfactory to themselves. At the time when the owners of the ranch made a proposition which defendants were willing to accept, it was known by all of the parties that defendants had not procured the conveyance of the interest of the heirs in the office building, and we do not deem it a matter of much importance whether the acceptance by defendants of the proposition made by the Small brothers was in the language detailed by plaintiffs or in that claimed by defendants. All of the parties knew and understood that the acceptance was in fact conditioned on the acquisition of the title to the build-

ing, and the consummation of the transaction was deferred until the next day for the purpose of affording defendants an opportunity to obtain the title.  The only effect of the acceptance on the rights of the parties was to impose on defendants the obligation to carry out in good faith the agreement orally made with the other heirs, and had they failed to do this, through their own fault, we are of opinion plaintiffs would have been entitled to recover their commission, since, when it should transpire that defendants, by agreement with the other heirs had placed themselves in a position to transfer the complete title to the property, their acceptance of the proposition for exchange brought about through the instrumentality of the agents, would have completed the labors of the latter, and therefore, earned for them their right to compensation.  On the other hand, the refusal of the heirs to comply with their oral agreement on which defendants, in good faith, relied, would prevent the occurrence of one of the events on which, under the contract, defendants were to become liable for a commission; and manifestly, it would be against the spirit of the contract, as well as harsh and unjust, to hold them liable on account of their honest, though mistaken, reliance on an unenforcible and unexecuted agreement of their co-heirs to sell their interests.

Under the evidence most favorable to plaintiffs, there was but one issue to go to the jury, namely, the good faith of defendants in the transaction with their brother, John.  On finding that the refusal of the latter to convey his interest on the terms previously agreed was not by the procurement or connivance of defendants, plaintiffs should be held to be without a cause of action; while on the finding that the refusal of the recalcitrant heir was collusive and that defendants were parties to the deception, plaintiffs would be entitled to recover, since the other facts constitutive of their cause of action are not in controversy.  We find the instructions to be

in accord with the views expressed. Plaintiffs' refused instruction is subject to the criticism of being misleading. Had it been given, it would have amounted, in effect, to a peremptory direction to find for them, as it is conceded by all of the witnesses, including defendants, that as between defendants and the owners of the ranch, it "was the act of the former which prevented said exchange of properties being made," but the evidence reasonably supports the inference that the act was compelled against the wishes of defendants by a circumstance which they could not avoid and which, under the contract of employment, of itself, was sufficient to absolve them from liability for a commission, and the adoption of this conclusion by the jury as we have shown, would justify a verdict for defendants, despite the fact that as between the parties to the proposed exchange, it was the act of defendants that prevented its consummation.

What we have said answers all of the questions raised by plaintiffs and, finding no error in the record, it follows that the judgment must be affirmed. All concur.